UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELIJAH McKINNEY,

     Petitioner,

v.

UNITED STATES OF AMERICA,

     Respondent.

_____/

Civil Case Number 16-11906
Criminal Case Number 14-20698
Honorable David M. Lawson

## OPINION AND ORDER GRANTING MOTION TO AMEND, DENYING MOTION FOR DISCOVERY, AND DENYING MOTION TO VACATE SENTENCE

Petitioner Elijah McKinney was one of six conspirators who committed a series of "smash and grab" jewelry store robberies in 2014 in Detroit, Michigan and other states. Their *modus operandi* was to send one or two of the group to case the stores, and others would return later with sledge hammers, which were used to smash the display cases and steal expensive watches and other valuables. McKinney pleaded guilty to the single-count superseding indictment charging conspiracy to violate the Hobbs Act (interference with commerce by robbery), 18 U.S.C. § 1951(a), without a plea agreement. He was sentenced to 92 months in prison. He did not file a direct appeal.

McKinney then filed a *pro se* motion under 28 U.S.C. § 2255 to vacate his sentence alleging that his attorney performed deficiently at the sentencing phase of the case. The Court appointed new counsel for McKinney, who then moved to amend the petition to add a claim under *Brady v. Maryland*, 373 U.S. 83 (1963). Counsel also moved for discovery. An evidentiary hearing was conducted at which McKinney's trial counsel testified. The parties filed supplemental briefs.

The *Brady* claim has a direct bearing on the petitioner's sentencing issue and arose from some of the same facts. The Court will grant the motion to amend the petition to add that claim.

The petitioner has not shown any likelihood that the material he seeks through discovery — recordings of "jail calls" involving the petitioner and other coconspirators — actually exists, or that there is good cause to order the discovery. That motion will be denied. Finally, McKinney was not prejudiced by the government's failure to disclose certain statements of a codefendant; and McKinney's trial attorney made reasonable strategic decisions when representing him during the sentencing phase of the case and performed well within established professional norms. Therefore, the motion to vacate the sentence will be denied.

## I. Background

McKinney focuses his main argument on the application of the "dangerous weapon" enhancement found in section 2B3.1(b)(2) of the Sentencing Guideline Manual. That section calls for enhancements ranging from seven levels (if a firearm was discharged) to two levels (if a death threat was made). Relevant here, the section prescribes a three-level increase "if a dangerous weapon was brandished or possessed," U.S.S.G. § 2B3.1(b)(2)(E), and a four-level increase "if a dangerous weapon was otherwise used," U.S.S.G. § 2B3.1(b)(2)(D). At sentencing, the Court applied a four-level increase in the offense level, finding that a dangerous weapon — the sledge hammer — was "otherwise used" in committing the crime. McKinney says that because the sledge hammers only were "brandished," a three-level increase was all that was warranted, and his lawyer performed deficiently when he chose not to object or argue that point.

The grand jury charged McKinney in a single-count indictment with conspiracy to interfere with commerce by robbery, contrary to 18 U.S.C. § 1951(a), in connection with a multi-state "smash and grab" robbery spree at jewelry stores in various states, including New York and Maryland. On January 29, 2015, a superseding indictment was filed, which charged McKinney and five co-defendants with involvement in the conspiracy. Besides McKinney, the superseding

indictment also named Darius Ellis, Kordaryl Cross, Latrina Williams, Lorenzo Daniel Terry, and Anthony Jerome Browner. The sparse factual basis set forth in the indictment included an allegation that the defendants robbed the stores "by means of actual and threatened force," and "by use of hammers/sledgehammers."

McKinney pleaded guilty. During the plea colloquy, McKinney stated that he was "just the lookout guy for the guys who was going in, in the store." He admitted that he and other persons had planned to rob some jewelry stores and had carried out that plan by committing actual robberies, including in Maryland and New York. Plea Hr'g at 13-14, ECF No. 156, PageID.779-80. McKinney stated that he had planned the robberies with a person he knew only as "Theo," that the plan was hatched by the conspirators in Michigan, that everyone involved in the plan had an assigned role, and that his role was to be the lookout. *Id.* at PageID.780-81. He asserted that he had participated in two robberies between June and August 2015, during which a number of Rolex watches were stolen. *Id.* PageID.781.

At the sentencing hearing, the Court noted that there were no objections to the presentence report. The Court found that the base offense level, which was determined from the robbery guidelines, was 20, and a four-point enhancement was added under section 2B3.1(b)(2)(D) for use of a dangerous weapon. The Court applied a three-level enhancement for a loss amount exceeding $250,000, and a two-level enhancement for the occurrence of multiple crimes, which consisted of the two robberies. Sent. Hr'g at 6, ECF No. 151, PageID.715. After a three-level deduction for acceptance of responsibility, the net offense level was 26. *Ibid.* That, combined a criminal history category of IV, yielded a guideline range of 92 to 115 months. After noting the Court's concern about the dangerousness of the conduct involved in carrying out the robberies, the Court sentenced McKinney to 92 months in prison and ordered him to pay $340,935 in restitution to the owners of

the jewelry stores that were robbed. When asked at the end of the hearing if the defendant had any objections to the sentence that were not stated on the record, the defendant's attorney stated, "No." *Id.* PageID.731.

In a declaration, confirmed by testimony at the motion hearing, Steven Scharg, the defendant's trial attorney, stated that he received the presentence report in June 2015, and he noted that the probation department had scored four points for the use of a dangerous weapon under guideline section 2B3.1(b)(2)(D). Scharg considered objecting to the scoring of a fourth point for the "otherwise use" of a dangerous weapon under that section, and he believed that, although the case law on the point was debatable, an argument could be made that only three points for simple possession or brandishing, rather than "otherwise use" should be assessed. Scharg discussed this objection during a conference with counsel for the government, who informed him that the government planned to object to the absence of any points for a leadership enhancement under guideline section 3B1.1. Scharg determined that, although he was not certain that the government would prevail, "given the uncertainty regarding the interpretation of 'otherwise use' of a dangerous weapon, and the possibility that multiple leadership points could be assessed, [he] decided that, in [his] professional judgment, it was in Mr. McKinney's best interest to negotiate a pre-objection resolution to the potential PIR objections." Steven Scharg decl. ¶ 8, ECF No. 155-2, PageID.765. As Scharg explained, in his view:

> Both enhancements were certainly debatable. But, given the upside of reducing Mr. McKinney's net offense level by only 1-point and the downside of increasing Mr. McKinney's net offense level by a minimum of two points and up to four points, I felt that the resolution was clearly in Mr. McKinney's best interest, particularly given there was no mandatory minimum term of imprisonment and the Court could vary downward from the advisory guideline range based on the 3553 factors. I stand by my assessment, notwithstanding the fact that the Court ultimately ruled, in a later sentencing, that only 3-points should apply.

*Id.* ¶ 10 PageID.765.

At the sentencing of the petitioner's co-defendant, Kordaryl Cross, the Court discussed that same issue: scoring for use of a weapon under guideline section 2B3.1(b)(2). As the Court noted, that section contains provisions calling for a three-point enhancement to the offense level if a dangerous weapon is "brandished or possessed," or a four-point enhancement if a dangerous weapon was "otherwise used" in the commission of the crime. Sent. Hr'g at 5-6, ECF No. 157, PageID.791-92. Cross conceded (as McKinney evidently does here as well), that the sledge hammers used in the robberies qualified as a "dangerous weapon" according to the pertinent definition of that term set forth in guideline section 1B1.1. The parties' dispute, therefore, centered on whether the hammers were merely "brandished or possessed," or whether they were "otherwise used." Sent. Hr'g at PageID.792. The Court concluded, with particular emphasis on the interplay between the definition of "brandishing" and "otherwise used" in the associated application note, that the enhancement should be scored at three points, rather than four, principally because the phrase "otherwise used," read in the proper context, implied that the "use" must be "something more" than "brandishing," which itself required a use of the item for the purpose of intimidating or coercing a person in the course of the crime. The Court explained its reasoning as follows:

> Based upon [the language of application note 1(C) to guideline section 1B1.1], I infer that to brandish or otherwise use — and because the otherwise use definition incorporates a reference to brandishing — that the purpose of the item, the dangerous weapon, must be to intimidate [an] individual.
>
> I find that the sledge hammers in this case were not intended to be used to intimidate or to effectuate a threat in order to advise or convey the notion that the individuals must part with their property. Consequently, I'll sustain the objection. I find that the enhancement under 2B3.1(b)(2) should fall under category (E) and that would cause a three-level increase.

*Id.* at PageID.799-800. The same reasoning and three-point scoring were applied to the guideline calculations at the sentencings of each of McKinney's co-defendants, all of whom were sentenced after him.

During the pretrial phase of the case, the government produced to Mr. Sharg a considerable amount of discovery, which included documents, video from at least one of the stores that was robbed, and recorded interviews with several of the co-defendants, including Browner and Cross. However, the government asserts that a recorded interview with co-defendant Lorenzo Terry was produced only to Terry's attorney and not to McKinney's counsel. The government asserts that, during the process of the litigation of McKinney's post-conviction motion to vacate his sentence, it re-produced to McKinney's current attorney all of the trial phase discovery, and, due to an oversight, also inadvertently produced the Terry interview, before realizing that the Terry audio was not part of the original trial phase production.

McKinney now argues that Terry's recorded interview with the government's case agent suggests the following exculpatory facts, which were not available to McKinney's trial counsel: (1) that Cross gave Terry money for his participation in the Maryland robbery, and that this fact is supported by "jail calls" in the possession of the government's case agent; (2) that Terry was only acquainted with Browner prior to the conspiracy, Terry met Cross "through someone else", and Terry did not know McKinney at all; and (3) that Terry had a limited role in the conspiracy, which consisted solely of buying hammers, and, as such, he had little or no contact with McKinney, "did not ever see" McKinney, and McKinney did not give him any direction.

The recorded Terry interview and the transcript excerpts the government submitted do not confirm that any "jail calls" were recorded. Defense counsel points to statements by the government's agent in conversation with Terry that "people are stupid as in they never listen to the . . . thing when they make a jail call that say[s this] call is being recorded." Govt. Resp., Lorenzo Terry Interview Tr. at 2-3, ECF No. 174-5, PageID.906-07. However, it is unclear from the context of the interview what exactly is meant by that statement; or how that comment can be

construed to imply that any relevant "jail calls" actually exist; or who, if anyone, may have made them; or, if such calls do exist, what might be their subject or content.

In one part of the transcript, Terry actually appears to deny that Cross ever paid him any money for the Maryland robbery, and he asserts that Cross told him that the group did not get anything from it.

The government contends that other discovery materials, some of which it submitted as exhibits to its opposition to the discovery motion, back up its position that it was justified in seeking a leadership enhancement for McKinney. The government also asserts that statements made by Browner during his interview with the government — which was disclosed to McKinney's attorney during the trial phase — reflect similar comments suggesting that Browner interacted primarily with Cross and had limited interaction with McKinney. The government contends that this interview therefore supplied the same sort of information as the petitioner maintains was revealed in the Terry interview, consisting of suggestions that a co-defendant perceived Cross to be more a leader of the enterprise than McKinney.

## II. Motion to Amend

McKinney did not include a *Brady* claim in his original section 2255 motion. He now contends that the government should have disclosed the Alonzo Terry interview, because it shows that McKinney played no leadership role in the conspiracy. And he seeks to add that claim in a motion to amend his section 2255 motion.

The motion is governed by Federal Rule of Civil Procedure 15, which addresses amendments to pleadings. *Mayle v. Felix*, 545 U.S. 644, 649 (2005). That rule calls for liberal allowance of amendments, and states that the "amendment of a pleading relates back to the date of the original pleading when . . . the claim . . . asserted in the amended pleading arose out of the

conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."
Fed. Rule Civ. Proc. 15(c)(2). The proposed amendment satisfies that standard. McKinney
questions his lawyer's decision to trade the argument on the dangerous-weapon enhancement for
the government's argument on the leadership-role enhancement. The information in the Terry
interview could have influenced that judgment, and withholding it could have altered defense
counsel's calculations. The claims are sufficiently related so that the amendment is proper and
timely. *See Mayle*, 545 U.S. at 664 & n.7.

The Court will grant the motion to amend the section 2255 motion.

### III. Discovery Motion

In his discovery motion, McKinney asks for an order compelling the government to
produce the recorded "jail calls." The government responds that, with respect to those calls, the
offhand comment by the interviewer about "people" never paying attention to the warning that the
calls are recorded does not provide any basis to show that any such calls actually exist. Moreover,
the government contends that nothing in the Terry interview suggests anything about any topics
that could have been discussed or persons who could have been involved in making any such
unspecified and unidentified calls, and that the defendant's request for disclosure of them is based
on nothing more than speculation that call recordings could exist that might disclose statements
helpful to him.

Rule 6 of the Rules Governing Section 2254 and 2255 Cases provides that, in any habeas
proceeding under those rules, "[a] judge may, for good cause, authorize a party to conduct
discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Rule
6(a), Rules Governing Section 2254 and 2255 Cases; *see also* Rule 1(b) ("The district court may

apply any or all of these rules to a habeas corpus petition not covered by Rule 1(a) [Cases Involving a Petition under 28 U.S.C. § 2254].").

The petitioner has not established that good cause exists to compel discovery of "jail call" recordings, which the government says do not exist. The information in the record does not provide any basis for a conclusion that any such calls exist within the possession or control of the government, or that, if they do, they would disclose any information helpful to the petitioner on any of his claims.

It is difficult to discern what was the exact meaning or intent of the case agent's comment during the Terry interview, beyond prompting Terry to make some admission about his involvement in the crimes. Nothing in the comment that "people" ignore the canned warning played by jail phone systems during recorded phone calls suggests that any recordings of specific calls by any persons involved in the case here actually exist. Moreover, nothing in the exchange suggests any way in which the content of any such calls could be helpful to McKinney, either as to his claim that he was not subject to any leadership enhancement at sentencing, or as to the ineffective assistance and *Brady* claims raised in the motion to vacate sentence. Mere speculation is not enough to support a finding that failure to disclose information about any such "jail calls" violated *Brady* in the first instance, and it also is not enough to establish good cause to order disclosure of unidentified recordings that the petitioner merely presumes may exist and could support his claims in the present motion.

The motion for discovery will be denied.

IV. Section 2255 Motion

In his original motion, which was filed without the aid of counsel, McKinney raised two claims: (1) that his trial counsel was ineffective by failing to object to the four-point enhancement

for "otherwise use" of a dangerous weapon during the robberies, particularly where the Court later found, on materially identical facts, that only a three-point enhancement should apply to the guideline calculations of all his co-defendants; and (2) he is entitled to re-sentencing based on the "Inflationary Adjustment" to the loss amount tables in the guidelines, which went into effect in November 2015, where the revised loss amounts were used by the Court in sentencing all his co-defendants (who were sentenced after the effective date), but he was sentenced under the more punitive loss amount guidelines that were effective before the revisions. In a supplemental brief filed by appointed counsel, McKinney develops the first argument in more detail, but he does not pursue the "inflationary adjustment" argument, observing only that if he is resentenced, the current Guideline Manual will apply. As noted above, McKinney also adds the argument that the outcome of the sentencing proceeding was compromised by the government's failure or refusal to disclose the Lorenzo Terry interview and other information tending to undermine its position that the "leadership" sentencing enhancement could apply, thus causing defense counsel erroneously to overestimate the likelihood of the application of that enhancement.

A federal prisoner challenging his sentence under section 2255 must show that the sentence "was imposed in violation of the Constitution or laws of the United States," the sentencing court lacked jurisdiction, the sentence exceeds the maximum penalty allowed by law, or it "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "A prisoner seeking relief under 28 U.S.C. § 2255 must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).

A claim that could have been raised on direct appeal generally is not reviewable in a section 2255 motion. *Bousley v. United States*, 523 U.S. 614, 621 (1998). However, a claim that "cannot otherwise be reviewed for the first time on a § 2255 motion can be reviewed as part of a successful claim that counsel provided ineffective assistance." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). Claims of ineffective assistance of counsel are properly raised in a section 2255 motion. *United States v. Graham*, 484 F.3d 413, 421-22 (6th Cir. 2007) (quoting *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997)).

## A. Ineffective Assistance

To succeed on an ineffective assistance of counsel claim, the petitioner "must show both deficient performance and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). One way of establishing defective performance is to show that defense counsel missed a meritorious argument under the controlling law. However, the failure to file a meritless motion or raise a groundless objection does not constitute defective performance. *Jalowiec v. Bradshaw*, 657 F.3d 293, 321-22 (6th Cir. 2011) (stating that an "attorney is not required to raise a non-meritorious claim" (citing *Wilson v. Mitchell*, 498 F.3d 491, 514-15 (6th Cir. 2007))); *see also Knowles*, 556 U.S. at 123 (reiterating that the "[Supreme] Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success" to avoid a finding of deficient performance under *Strickland*).

McKinney does not argue that attorney Sharg missed a viable argument. All agree that Sharg was aware of the "otherwise use" issue in the dangerous-weapon enhancement section of the Guideline Manual. Instead, McKinney says that Sharg's judgment was faulty because he

traded away a viable — indeed, a winning — argument for a concession by the government not to press a position that certainly was a loser for it.

There is no avoiding the conclusion that Sharg's choice was a strategic one. And if "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 689, review of counsel's strategic choices is even more constricted, *Morris v. Carpenter*, 802 F.3d 825, 843 (6th Cir. 2015) ("Courts should not second-guess counsel's strategic decisions, and should presume that counsel's conduct is reasonable.") (citing *Strickland*, 466 U.S. at 689). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.

Determining if Mr. Sharg's strategic choice amounted to a "reasonable professional judgment," requires a look at the relative merits of both arguments.

### 1. The Dangerous Weapon Enhancement

Guideline Section 2B3.1(b)(2) provides in relevant part that, "if a dangerous weapon was brandished, or possessed," in the course of a crime, then three points should be added to the base offense level, U.S.S.G. § 2B3.1(b)(2)(E), and "if a dangerous weapon was otherwise used," then four points should be added, *id.* 2B3.1(b)(2)(D). The application notes to the definitional provisions of the guidelines define "brandished" to mean, "with reference to a dangerous weapon . . . that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person." U.S.S.G. § 1B1.1 cmt. 1(C). The phrase "otherwise used" means, "with reference to a dangerous weapon . . . that the conduct did not amount to the discharge of a

firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." *Ibid.* cmt. 1(*I*).

The Sixth Circuit has observed that "[f]inding a workable distinction between 'brandished' and 'otherwise used' is not a new issue," but it has stated that the pertinent question as: "When does conduct constituting 'brandishing' become sufficiently threatening such that the weapon was 'otherwise used?'" *United States v. Johnson*, 456 F. App'x 540, 543 (6th Cir. 2012). The court of appeals has "distinguished between displaying a firearm with an intent to intimidate, which is brandishing, and pointing a firearm at an individual and making a demand, which constitutes use beyond brandishing," reasoning that "the pointing of a firearm at an individual, coupled with a verbal order, conveys the implicit threat that failure to comply with instructions will result in immediate use of the weapon," but "merely brandishing the weapon in an attempt to intimidate an individual conveys only the mere possibility that the device may be used, but there is no imminent threat of use." *Ibid.*

As noted earlier, when sentencing McKinney's co-defendants, this Court held that the defendants' conduct with the sledge hammers amounted to "brandishing" because they were not intended to be used to threaten the jewelry store proprietors. The Court therefore assigned three enhancement points, not four, in those cases. But this was a close question. As the government points out, two other judges in this district when faced with the same question in other smash-and-grab cases reached the opposite result and applied a four-point enhancement when sentencing defendants for use of sledge hammers in cases involving similar strings of robberies.

2.  Role Adjustment

Guideline Section 3B1.1 imposes a sliding scale for enhancements based on a defendant's participation in a crime as a "leader or organizer," or as a "manager or supervisor" of a criminal scheme.  The guideline assigns enhancements to the tiers of leadership as follows:

(a)     If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b)     If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c)     If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G.§ 3B1.1.  "The primary question for a § 3B1.1(c) enhancement is whether the defendant exerted control over at least one individual within a criminal organization."  *United States v. Tanner*, 837 F.3d 596, 603 (6th Cir. 2016) (citing *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000)).  "Factors relevant to control include 'the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, [and] the degree of participation in planning or organizing the offense.'"  *Ibid.* (quoting *United States v. Salyers*, 592 Fed. App'x 483, 485 (6th Cir. 2015); U.S.S.G. § 3B1.1 cmt. 4)).  "For purposes of the adjustment, more than one defendant can lead participants in criminal activity."  *United States v. Christian*, 804 F.3d 819, 825 (6th Cir. 2015) (citing U.S.S.G. § 3B1.1 cmt. 4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.")).

McKinney's current attorney argues that he was at "no risk" of receiving this enhancement.  She points out that, although McKinney plainly was involved in at least one robbery with Kordaryl Cross, (1) he only knew Cross, and had not met any of the other conspirators before meeting them on the day each robbery was committed; (2) Cross recruited other conspirators, including the

getaway driver for one of the robberies, but McKinney did not recruit anyone; (3) Cross instructed other conspirators and met with a contact who agreed to buy the stolen goods once they were procured; (4) Cross did market research to find stores that carried the type of watches that his contact wanted and cased the stores he identified to plan how to rob them; (5) Cross met alone with his contact to sell the jewelry after the robberies and distributed cash to the other conspirators after closing the deal; and (6) the other conspirators themselves viewed Cross as the leader of the scheme.

To justify its position that it would seek a role adjustment enhancement, the government asserts that (1) the Lord & Taylor jewelry store video shows that the "casing" of the store was done by both Cross and McKinney; (2) during their walk-through of the store, it appears to be McKinney, not Cross, who points out entry and exit points, while Cross just follows him around the store; (3) co-defendant Browner stated in his interview with the government that both McKinney and Cross cased that store before the robbery; (4) Cross and McKinney together rented a hotel room used by the conspirators for the New York robbery; (5) Cross cased the store before the Maryland robbery, while McKinney cased the store before the New York robbery — thus showing that they divided this leadership role equally; and (6) during a shopping mall robbery, both McKinney and Cross remained outside, while sending their "disposable pawns" Browner and Ellis in to do the on-site work, further suggesting that they both shared an elevated role in the enterprise.

Close question?  Perhaps less so than the dangerous-weapon enhancement argument.  But the government's position on the role adjustment was neither frivolous nor fanciful, and Mr. Sharg had to give it serious consideration.

### 3. Counsel's Performance

Whether or not McKinney has advanced persuasive arguments that the four-point "otherwise use" or "leadership" enhancements ought not to have applied to the calculation of his sentencing guidelines, he has not established that his attorney's conduct was professionally unreasonable where he made the strategic choice to trade away a possible objection to the "otherwise use" enhancement in exchange for an assurance that the government would not seek a leadership role enhancement. "It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence,'" but "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 689).

And second-guessing trial counsel's judgment call with the benefit of hindsight is exactly what McKinney urges the Court to do here. He has not alleged that his attorney did not review the information that was disclosed in discovery that both favored and countered the government's position that a leadership enhancement ought to apply to McKinney for his role in the crimes. The government has pointed to information in the record suggesting that it had a plausible prospect of obtaining a minimum of a two-point enhancement if the Court accepted its position that McKinney was a leader of the conspiracy. Mr. Sharg decided, in light of the available information, that it was better to take hold of a two-point "bird in the hand" than to gamble on the capture of a one-point "bird in the bush." That is precisely the sort of strategic judgment by counsel which, if "made after thorough investigation of law and facts relevant to plausible options [is] virtually unchallengeable." *Strickland*, 466 U.S. at 690-91. McKinney may — at least now, with the benefit of hindsight — disagree with his trial attorney's professional judgment. But he has not offered a

sufficient basis for concluding that the call strayed beyond the realm of a reasonably competent and informed strategic exercise of professional judgment.

McKinney points to excerpts of interviews with co-defendants Browner, Terry, Ellis, and Williams, which, he contends, tend to support the view that none of the co-defendants knew McKinney before the robberies, all were recruited by Cross and not by McKinney, and all viewed Cross rather than McKinney as the leader of the scheme. However, none of the statements that he highlighted call into question the other information that the government previously pointed out from the record, which suggested that McKinney also played some role in directing the scheme along with Cross.

The government contends that the interview statements by Terry, Ellis, and Williams provide little or no information about who led the robbery scheme, and, anyway, the fact that co-defendants made statements suggesting that Cross played a leadership role does nothing to negate the possibility that McKinney also had a hand in directing the scheme along with Cross.

Browner stated during his interview that Cross "funded the whole thing. He paid for the rooms, he paid for us to get all the gear, he paid for the use of each car, he had to pay his mans . . . for lettin [sic] us use [] the Impala to drive all the way out there which was hot as hell." Browner Interview Tr. at 4, ECF No. 190-2, PageID.1086. However, Browner also confirmed that, for at least one of the robberies, Cross and McKinney both "went in to check the place out." *Id.* at PageID.1089. Ellis stated that he recognized McKinney from seeing him with Cross, and that McKinney "was [Cross's] boy." Ellis Interview Tr. at 1-2, ECF No. 190-3, PageID.1091-92.

Scharg testified that, during their discussions about the case, McKinney refused to accede to any deal in which he was assessed points for a leadership role, and McKinney told Scharg to object to the "dangerous weapon" enhancement relating to the hammer. The petitioner also

contends that Scharg's testimony establishes that his discussion with McKinney about the leadership enhancement that took place on the day of the sentencing was superficial and did not involve any extensive review of the applicable case law or facts pertinent to the supposed risk that the government would seek that enhancement. The petitioner also points out that Scharg testified that McKinney's acceptance of the "horse trading" over the disputed enhancements was motivated in part by McKinney's desire to have the sentencing concluded sooner than later, and to avoid an adjournment that Scharg advised him would be necessary if McKinney wanted to mount an effective objection on the leadership issue. McKinney also mentioned that Scharg conceded that he was unaware of a Fifth Circuit decision from a month before McKinney's sentence hearing in which a 3-point enhancement was found to be proper on similar facts, in another "smash and grab" case.

But Sharg also testified that his concern about the leadership enhancement was based on (1) his representation of McKinney in an unrelated 2013 state court criminal matter involving a similar robbery scheme, in which testimony clearly suggested that McKinney played a leadership role; (2) his review of the Lord & Taylor store video, where Cross and McKinney are seen casing the store together; (3) Browner's description of Cross's role in the scheme (to "check out" places and determine the best escape route, after which Browner and others would go in and commit the actual robberies); (4) the fact that McKinney and Cross took turns casing locations for the White Plains and Annapolis robberies; and (5) the fact that McKinney had left Michigan in violation of his parole conditions and lied about leaving the state when he later was caught. Scharg's review of those circumstances with McKinney on the day of the sentencing was within the realm of professionally reasonable and diligent representation. Scharg confirmed that if McKinney had not

accepted the terms of the deal, he would have sought an adjournment in order to litigate the disputed enhancements, which is something McKinney did not want to do.

Moreover, McKinney does not maintain that no points at all should have been assessed under the "dangerous weapon" guideline. Instead, he only contends that he should have been subjected to a three-point score for that enhancement, rather than four points. The most that he contends that he could have gained, therefore, was a one-point "win" if the lower scored enhancement were applied, as opposed to the possible two-point (or worse) "loss" on a possible leadership enhancement. And it cannot be said, from the reasonably informed perspective of trial counsel at the time, that McKinney had a "sure thing" in his chances of prevailing on this point.

Sharg did not perform deficiently, and McKinney did not suffer a deprivation of his Sixth Amendment right to counsel.

## B. Failure to Disclose

McKinney also argues that the Lorenzo Terry interview contained information that could have impacted his attorney's judgment on whether to challenge the dangerous-weapons enhancement. He says that the failure to turn that over to Mr. Sharg before the plea hearing violated his rights under the Due Process Clause.

It is well known by now that suppression by the prosecution of evidence favorable to the defendant upon request violates the Due Process Clause where evidence material to either guilt or punishment of the defendant is withheld, irrespective of the good or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). There are three components of a *Brady* violation claim: (1) the withheld evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the state, either

willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

McKinney has not advanced a convincing basis for a *Brady* claim based on the failure to disclose the Terry interview recording, or based on his speculation that the government also failed to disclose recordings of "jail calls," which, he supposes, would further bolster his claim that he was not a leader in the robbery scheme.

*First*, McKinney must establish that the evidence withheld would have been exculpatory — that is, that it would have tended to exonerate him — or that it would have aided him in rebutting an argument or impeaching evidence offered by the government. The petitioner's "mere speculation" that the information would somehow have been helpful to him is insufficient to establish the exculpatory nature of the evidence. *Wood v. Bartholomew*, 516 U.S. 1, 6 (1996); *Thorne v. Timmerman-Cooper*, 473 F. App'x 457, 466-67 (6th Cir. 2012). Terry's statements on who led the conspiracy were equivocal at best. Terry never stated in the interview that he was paid by either Cross or McKinney; in fact Terry repeatedly insisted that he never was paid by anyone for any of the robberies.

*Second*, the burden is on the petitioner to prove that evidence that is required to be disclosed to him under *Brady* was not disclosed. *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). Conclusory allegations will not do. *See Burns v. Lafler*, 328 F. Supp. 2d 711, 724 (E.D. Mich. 2004). McKinney has identified the Terry statement which now is in the record and can be evaluated for its exculpatory benefit. But there is no information that any "jail calls" exist, or what their contents might have been.

Finally, the petitioner must show that he suffered prejudice as a result of the failure to disclose. The failure to disclose the *Brady* material need not be "outcome determinative." *Smith v. Cain*, 565 U.S. 73, 75-76 (2012). As the Supreme Court has explained:

> "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence," only that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted).

*Ibid.* McKinney's showing on this element falls short for several reasons.

*First*, he certainly cannot establish that the outcome of the sentencing proceeding itself was in any way compromised due to any alleged failure by the government to disclose anything pertinent to his "leadership role," because the government never objected to the omission of leadership enhancement points from the PSR, the Court never considered applying any leadership enhancement, and the guideline calculation did not include any points for a leadership role. There is no probability at all that the outcome of the sentencing proceeding would have been any different, *see Cone*, 556 U.S. at 469-70, regardless of any information relating to the petitioner's leadership role that was or was not disclosed, where the question whether he acted as a leader or organizer of the conspiracy never was put at issue in that proceeding.

*Second*, McKinney's reliance on the theory that the failure to disclose was detrimental to the "bargaining process" that led his trial attorney to make the strategic exchange of concessions not to object is unconvincing. He cannot establish that the content of the Terry interview, or any other information that he has pointed to in the record, would have, if it was known to his trial attorney, made the strategic judgment at issue demonstrably professionally unreasonable. In the excerpted portions transcribed by the government, Terry does not appear to make any positive

assertions about McKinney's role in the conspiracy. Contrary to the petitioner's assertions, Terry in fact appears repeatedly to deny that Cross paid him anything for his participation, and he seems to claim that Cross told him the group received nothing from at least one of the robberies, and that Cross refused to pay him when Terry asked for his cut.

Moreover, even if some of Terry's comments could be read as supporting a conclusion that Cross played a leadership role, nothing that the petitioner has pointed to in the interview affirmatively suggests that McKinney did not also play such a role. "For purposes of the adjustment, more than one defendant can lead participants in criminal activity." *United States v. Christian*, 804 F.3d 819, 825 (6th Cir. 2015) (citing U.S.S.G. § 3B1.1 cmt. 4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.")). And even if Terry's comments do tend somewhat to weaken the government's position, McKinney's argument disregards the other information that the government points to, which does support at least a colorable — if, perhaps, weak — argument that McKinney played some part in coordinating and organizing the robberies.

Nothing said in the Terry interview is of such gravity as to compel the conclusion that, had McKinney's attorney known about it, he could not possibly reasonably have maintained a legitimate apprehension that the government would prevail in its position that the leadership enhancement should apply. As long as that apprehension was reasonable — and would have remained reasonable even taking into account any statements by Terry — the choice by McKinney's attorney to trade away a possible one-point gain to foreclose the risk of a possible two- or four-point loss was an exercise of strategic judgment which, when made after an adequate investigation, may not be second-guessed, and must be presumed by the Court to be reasonable. *Morris*, 802 F.3d at 843. Such "strategic choices made after thorough investigation of law and

facts relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690-91, and the added information put forth in support of the putative *Brady* claim does not supply any more basis for the challenge here than the arguments advanced in the original petition.

McKinney is not entitled to relief on his *Brady* claim.

## V. Conclusion

Even though the Court ultimately determined in the cases of McKinney's co-defendants that the dangerous-weapon enhancement called only for three levels and not four, his attorney's performance in choosing not to object to that part of the PSR did not amount to deficient performance. The information in the Terry interview did not make a difference in that decision, and the government's failure to disclose it did not affect the outcome of the case.

Accordingly, it is **ORDERED** that the petitioner's motion to amend his petition under 28 U.S.C. § 2255 (ECF No. 170) is **GRANTED**.

It is further **ORDERED** that the motion to compel discovery (ECF No. 169) is **DENIED**.

It is further **ORDERED** that motion to vacate sentence (ECF No. 143) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date: October 8, 2019

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on October 8, 2019.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI